# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

---

**DENIS LEE BROWN**
          **Plaintiff,**

    **v.**                       **Case No. 20-C-640**

**KILOLO KIJAKAZI,**[1]
**Acting Commissioner of the Social Security Administration**
          **Defendant.**

---

## DECISION AND ORDER

Plaintiff Dennis Brown applied for social security disability benefits, based primarily on a right shoulder impairment. (Tr. at 287, 319.) An Administrative Law Judge ("ALJ") concluded that plaintiff could still perform a range of light work with additional reaching and handling limitations. (Tr. at 143.) The ALJ purported to give great weight to the opinions of Dr. Jonathan Main, plaintiff's treating orthopedic surgeon, but failed to specifically address certain restrictions endorsed by Dr. Main. (Tr. at 149.) The Appeals Council remanded for reconsideration (Tr. at 160-62), but on remand the ALJ decided to give only partial weight to Dr. Main's opinion, rejecting most of the restrictions at issue (Tr. at 27).

In this action for judicial review, plaintiff argues that Dr. Main's opinion is entitled to controlling weight, and that once such weight is given an award of benefits must follow. In the alternative, he asks for a remand for further proceedings, arguing that the ALJ also erred in his evaluation of a functional capacity evaluation completed by two physical therapists. For the reasons that follow, I conclude that the matter should be remanded for further proceedings.

---

[1]Pursuant to Fed. R. Civ. P. 25(d), Kilolo Kijakazi is substituted as the defendant in place of Andrew Saul.

## I. FACTS AND BACKGROUND

Plaintiff applied for benefits in February 2015, initially alleging a disability onset date of November 29, 2004, when he fell and seriously injured his shoulder at work. (Tr. at 287, 698, 701.) Plaintiff subsequently amended the onset date to February 2, 2009, when he turned 50 years old. (Tr. at 405, 409.) Because plaintiff's insured status expired at the end of that year, in order to obtain disability insurance benefits ("DIB") he had to prove that he became disabled between February 2, 2009, and December 31, 2009. (Tr. at 13-14.)

The medical evidence collected by the agency shows that plaintiff underwent right rotator cuff repair surgery performed by Dr. Main in December 2004. (Tr. at 643, 698, 737-39.) He initially reported improvement, commencing physical therapy. (Tr. at 694-97.) Dr. Main kept plaintiff off work (Tr. at 694), advancing his work restrictions in May 2005 to lifting 5 pounds at shoulder height, no weight overhead, and 10 pounds at the side, although noting it was unlikely there was any work for him with these restrictions. (Tr. at 693.) In June 2005, Dr. Main increased the weight limit to 15 pounds on the right side and 10 pounds at the right shoulder. (Tr. at 692.)

In September 2005, plaintiff was noted to be progressing well, with markedly improved shoulder functioning, but he then began complaining of right hand numbness (Tr. at 689), and an EMG revealed moderate carpal tunnel syndrome, for which Dr. Main then recommended splinting and physical therapy (Tr. at 688). In November 2005, Dr. Main noted reduced range of shoulder motion and slightly reduced strength; hand examination was unchanged. Dr. Main indicated that, overall, plaintiff was doing well given the size of the tear, but he was 11 months out and still not back to work. Dr. Main endorsed restrictions of 20 pounds overhead and 30 pounds at waist height, suggesting that plaintiff undergo a functional capacity evaluation

2

("FCE"). (Tr. at 687.) The evaluation determined that plaintiff could handle "medium" work. (Tr. at 1005.)

In December 2005, Dr. Main put plaintiff back to medium work, as the FCE recommended. Dr. Main noted that plaintiff had excellent motion and good strength, but he still complained of anterior shoulder pain. (Tr. at 686.) Those symptoms persisted in early 2016, and Dr. Main ultimately recommended another surgery (Tr. at 684-85), which he performed in August 2006 (Tr. at 743-45).

In September 2006, Dr. Main noted that plaintiff was making very slow progress, also complaining of neck spasms and diffuse numbness and tingling in the right hand. On exam, he demonstrated good pendulum exercises and forward elevated 90 degrees. Dr. Main could passively get him to 120 degrees but with pain beyond 90 degrees. Plaintiff also exhibited subjective decreased sensation in a glove-like distribution in the right hand. Dr. Main continued therapy, prescribed Vicodin for pain control, and limited plaintiff to seated, left-handed work only. (Tr. at 682.) During follow ups in October, November, and December 2006, plaintiff continued to complain of persistent pain. (Tr. at 679-81.) In January 2007, plaintiff exhibited reduced range of motion and moderate pain with impingement. He had good motor strength with some breakaway weakness with external rotation, supraspinatus, and subscap strength testing. On examination of the hand, he had full range of motion of all digits with some subjective decreased sensation. Dr. Main continued physical therapy, maintained current work restrictions, and referred plaintiff to another doctor regarding his right hand. (Tr. at 678.)

During a March 2007 follow-up, plaintiff complained of persistent numbness and tingling in his hand. On exam, he had full, fluid range of motion of the shoulder, with good motor strength, although he stated it was painful at about 100 degrees of forward elevation and

3

abduction. His hand examination was unchanged. Dr. Main noted that from a strength and motion standpoint plaintiff was doing very well, but he had persistent subjective shoulder pain. (Tr. at 677.)

In April 2007, plaintiff reported persistent pain, his symptoms essentially unchanged. He did state that overall he was much better than prior to his surgery when he could not lift his arm, but he still had residual discomfort at terminal forward elevation and abduction. Dr. Main ordered a repeat MRI, indicating he would make recommendations based on that. (Tr. at 674.) Plaintiff also had preexisting carpal tunnel syndrome, which had been episodic, but now was constant. (Tr. at 674.) During an exam later that month, plaintiff was able to forward elevate to about 90 degrees; passively, Dr. Main could get him a little higher. He had some weakness with external rotation. At 5-/5, his subscapular strength was good. Dr. Main assessed status post rotator cuff repair with healed supraspinatus and infraspinatus, now developing some erosion of the glenohumeral joint superiorly, which was rather significant and very concerning. Dr. Main indicated plaintiff may require a resurfacing type arthroplasty for pain relief in the future. Plaintiff declined an injection at that time. Dr. Main concluded: "He essentially has significant glenohumeral arthrosis. Therefore, with his persistent pain, loss of motion, and glenohumeral arthrosis, his permanent partial disability rating is 50%. His permanent restrictions are no overhead activities, 10 pounds to shoulder height, and 30 pounds at the side." (Tr. at 673.)

In August 2007, plaintiff under went a functional capacity evaluation with Lisa Hannes, P.T., and Michael Hansen, P.T. (Tr. at 982.) The FCE recommended no restriction in sitting or standing; restrict walking to level surfaces and duration to less than one mile; limit climbing to five flights; avoid reaching overhead; limit carrying on the right to 10 pounds occasionally and

4

5 pounds frequently, on the left to 25 pounds occasionally and 20 pounds frequently, and bilaterally to 15 pounds occasionally and 10 pounds frequently; limit pushing/pulling to 20 pounds frequently and 60 pounds occasionally bilaterally, 20 pounds occasionally and 10 pounds frequently on the right, and 40 pounds frequently and 60 pounds occasionally on the left; limit lifting from floor to waist to 15 pounds occasionally and 5 pounds frequently on the right, 20 pounds occasionally and 15 pounds frequently on the left, and 20 pounds occasionally and 15 pounds frequently bilaterally; limit lifting from the waist to shoulder to 5 pounds occasionally and 2-3 pounds frequently on the right, 10 pounds occasionally and 5-7 pounds frequently on the left, and 5-7 pounds frequently bilaterally; and avoid forceful gripping on the right. (Tr. at 985.) Hannes and Hansen concluded that plaintiff would be classified by the Dictionary of Occupational Titles ("DOT") as in a sedentary to light work capacity. Utilizing his right arm in his past job duties would not be feasible. "Based on objective findings of the FCE, it is the opinion of the evaluation that the previous, established level of disability rating offered by Dr. Main, appears to be fairly accurate." (Tr. at 986.)

During an October 2007 visit with Dr. Main, plaintiff continued to report some numbness and tingling in the hand. His presentation was somewhat atypical. He wanted to work but could not. Dr. Main referred plaintiff to another physician for evaluation and for an EMG, continuing current work restrictions. (Tr. at 671.)

In January 2008, Dr. Main noted that the EMG revealed a moderate right median neuropathy of the wrist, progressively worsened since the previous EMG in September 2005. Dr. Main believed plaintiff needed a carpal tunnel release. (Tr. at 667.)

In July 2008, plaintiff advised Dr. Main that his symptoms had not changed with regards to his shoulder and hand. Dr. Main again recommended carpal tunnel release, as plaintiff was

5

already wearing wrist splints and had treated this conservatively for a number of months with only increased symptoms and increased changes on the EMG. (Tr. at 1524.)

In September 2008, plaintiff reported a recent exacerbation of right shoulder pain where he said it swelled up, but that was now resolved. His overall complaints of pain and weakness were unchanged. He still described a glove-like numbness and tingling in his right upper extremity. He had seen a neurologist and been placed on Lyrica. On exam, "he has essentially full range of motion with good motor strength, but he does describe pain. He once again says that he has decreased glove-like distribution in the entire right upper extremity." (Tr. at 664.) The EMG had revealed moderate carpal tunnel syndrome. Dr. Main had no explanation for his subjective numbness and tingling. There was no evidence of radiculopathy. Dr. Main thought plaintiff needed a carpal tunnel release; he had nothing more to offer with regard to the shoulder, maintaining current work restrictions and recommending no further shoulder surgery. (Tr. at 664.)

On May 2009, shortly after the alleged onset date, plaintiff returned to Dr. Main, complaining of persistent right shoulder pain, but more bothered by some persistent numbness and tingling in the right arm. On exam, he had "full fluid range of motion of the shoulder. No significant crepitus. His external rotation and supraspinatus strength test is good. Hand examination is unchanged." (Tr. at 662.) Dr. Main's impression was status post rotator cuff repair, with a second operation for debridement of scarring. Dr. Main had no explanation for the persistent pain. Dr. Main stated: "Persistent right upper extremity numbness in a glove-like distribution. He does have carpal tunnel syndrome by EMG, but this would not explain [his] newly added symptoms. It is possible that his symptoms could improve with carpal tunnel release or they might not. It is hard to tell." (Tr. at 662.) Dr. Main sent him for a hand

6

evaluation. (Tr. at 662.)

During a November 2009 follow-up with Dr. Main (their last visit before plaintiff's insured status ended), plaintiff reported some anterior shoulder pain. On exam, he displayed tenderness along the biceps and the subscapularis, but good subscap strength. Plaintiff declined injections but agreed to a course of physical therapy. (Tr. at 660.)

In January 2011, plaintiff reported persistent and significant right shoulder pain and loss of motion. On exam, he could forward elevate 90 degrees and abduct 90 degrees. He had good external rotation strength but significant pain with passive elevation beyond his active limits. There was some crepitus. His motor and sensory exam was grossly intact. Scans revealed advanced osteoarthritis of the glenohumeral joint with joint space narrowing. Dr. Main's impression was status post multiple shoulder surgeries from the injury back in 2004. "He appears to have progressed osteoarthritis of the right shoulder." (Tr. at 656.) Dr. Main indicated that ultimately for pain relief plaintiff was going to need another surgery on the right shoulder. (Tr. at 656.)

In July 2011, Dr. Main noted that's plaintiff's symptoms persisted; he reported debilitating right shoulder pain, as well as numbness and tingling in the hand. Physical exam was unchanged. Dr. Main assessed right shoulder osteoarthritis and moderate to severe carpal tunnel syndrome, right hand. His findings and recommendations remained the same: he recommended hemiarthroplasty of the shoulder and carpal tunnel release, continuing "current work status." (Tr. at 648.)

In July 2012, Dr. Anthony Romeo performed a right reverse total shoulder arthroplasty. (Tr. at 928.) In August 2013, Dr. Romeo limited plaintiff to sedentary work, a lifting maximum of 10 pounds and no work at or above shoulder level. (Tr. at 926.)

After plaintiff filed his application in 2015, three agency medical consultants reviewed the records. At the initial level of review, in April 2015, Dr. Pat Chan found that plaintiff could perform light work with occasional lateral reaching and handling on the right and no overhead lifting with the right upper extremity. (Tr. at 116-17.) At the reconsideration level, in August 2015, Dr. Mina Khorshidi opined that plaintiff could handle light work with occasional lateral reaching on the right, frequent handling, and no lifting overhead with the right arm (Tr. at 128-29), and in September 2015 Dr. Louis Chelton agreed with those exertional, postural, and manipulative limitations (Tr. at 1181). Dr. Chelton also offered an opinion on Dr. Main's 2007 permanent restrictions of no overhead activities, 10 pounds to shoulder height, and 30 pounds at the side, stating: "The issue of permanent restrictions is reserved for the Commissioner of SSA and therefore the opinion can be given no wt. In addition, this recommendation is not fully supported by the current objective evidence." (Tr. at 1181.)

Following denials at the initial and reconsideration levels, plaintiff requested a hearing before an ALJ. Following that hearing, in a January 2018 decision, the ALJ denied plaintiff's application. (Tr. at 134-57.) As indicated above, the ALJ gave great weight to Dr. Main's April 2007 opinions, but he did not specifically address (or incorporate into the RFC) Dr. Main's restrictions of no overhead activities, lifting 10 pounds to shoulder height, and lifting 30 pounds at the side. (Tr. at 149.) The Appeals Council remanded for reconsideration. (Tr. at 158-63.)

On June 20, 2019, plaintiff appeared with counsel for his hearing on remand. The ALJ also summoned a vocational expert ("VE") to offer testimony on jobs plaintiff might be able to do. (Tr. at 40.)

Plaintiff testified that he was then 60 years old and last worked in November 2004 as a spray painter and auto body repairer. (Tr. at 57.) He indicated that his right shoulder had not

8

improved at all but rather had gotten worse. (Tr. at 57.) He testified that he did not do much due to pain. (Tr. at 60.)

The VE classified plaintiff's past work as a composite job consisting of auto body repairer, medium generally, heavy as performed, and spray painter, medium generally and heavy as performed. (Tr. at 62-63.) The ALJ then asked a hypothetical question, assuming a person of plaintiff's age, education, and work experience, capable of light work, limited to frequent lateral reaching with the right arm, no overhead work with the right arm, and frequent handling with the right arm. (Tr. at 63.) The VE testified that such a person could not do plaintiff's past work. The VE noted that the DOT and its accompanying publications did not address utilization of one arm or separate planes of reaching. (Tr. at 64.) Using the "OccuBrowse" program, the VE identified other jobs the person could do: folding machine operator (86,000 jobs in the nation), yardage control clerk (350,000 jobs), and wing mailer machine operator (85,000 jobs). (Tr. at 65.)

Plaintiff's counsel changed the hypothetical to occasional lateral reaching on the right and occasional handling on the right. (Tr. at 66.) In response, the VE identified positions of counter clerk (400,000 jobs in the nation), surfacing machine operator (200,000 jobs), and scaling machine operator (60,000 jobs). (Tr. at 67.)

Counsel then asked a hypothetical based on the restrictions in the 2007 FCE, which, as indicated above, assessed plaintiff's lifting abilities on the left, right, and bilaterally, and from floor to waist and waist to shoulder. (Tr. at 71.) The VE testified that the DOT and its accompanying publications did not separate lifting as indicated in the hypothetical, so she had to take the lowest level of lifting, which put the individual at the sedentary level. (Tr. at 71-72.) Finally, counsel asked a hypothetical based on Dr. Main's April 2007 restrictions of "no

9

overhead activities, only ten pounds to shoulder height, and only 30 pounds at the side." (Tr. at 72.) The VE responded:

> A  No overhead would be no reaching because as I've said, the DOT does not separate overhead reaching from lateral or downward or forward or planed as it were.
> . . .
> Okay. So neither the DOT nor its accompanying publications address lifting to shoulders or lifting to the side. It just talks about lifting. With lifting . . . 10 pounds to the shoulder and 30 pounds to the side, puts the individual at light with no reaching. Is that correct?
>
> Q  Yes. I mean based on your translation of overhead activities to reaching, yes.
>
> A  Well, it's not mine. It's the DOT's. There are no jobs.

(Tr. at 72-73.)

On August 7, 2019, the ALJ again issued an unfavorable decision. (Tr. at 10.) Following the familiar five-step evaluation process, see 20 C.F.R. § 404.1520(a), the ALJ determined:

> (1) that plaintiff had not engaged in substantial gainful activity from the alleged onset date of February 2, 2009, through his date last insured of December 31, 2009 (Tr. at 15);
>
> (2) that he suffered from the severe impairments of degenerative joint disease, glenohumeral arthrosis, carpal tunnel syndrome, and degenerative disc disease (Tr. at 15-18);
>
> (3) that none of these impairments qualified as conclusively disabling under the agency's Listing of impairments (Tr. at 19);
>
> (4) that plaintiff had the residual functional capacity ("RFC") to perform light work, with frequent lateral reaching with the right upper extremity, no overhead reaching with the right upper extremity, and frequent handling with the right upper extremity (Tr. at 19), which preluded the performance of plaintiff's past work (Tr. at 28-29); but
>
> (5) that plaintiff could perform other jobs, as identified by the VE, including folding machine operator, yardage control clerk, and wing mailer machine operator.

10

(Tr. at 29-30.) The ALJ accordingly found plaintiff not disabled. (Tr. at 31.)

In determining RFC, the ALJ considered plaintiff's alleged symptoms and limitations, as well as the medical opinion evidence. (Tr. at 19.) Plaintiff alleged disability due to arthritis, right shoulder surgery, and chronic pain. He reported worsening of his conditions since filing his application, noting that pain and reduced range of motion affected his ability to manage personal care, perform household chores, and engage in social activities. The ALJ found that while plaintiff's impairments could reasonably be expected to cause the alleged symptoms, plaintiff's statements concerning the intensity, persistence, and limiting effects of these statements were not entirely consistent with the evidence of record. (Tr. at 20.)

In support of this finding, the ALJ reviewed the medical evidence prior to the amended onset date (February 2, 2009), which revealed a 2004 right shoulder injury for which plaintiff underwent surgeries, as well as receiving other treatment including physical therapy and medication. (Tr. at 20-22.) The ALJ acknowledged that the evidence showed plaintiff had persistent pain and abnormal sensation despite the surgeries, yet the evidence also documented relatively good objective findings during examinations, as well as some improved symptoms with medication and a wrist splint for carpal tunnel. (Tr. at 22.)

During a follow-up exam with Dr. Main on May 2009, plaintiff reported persistent shoulder pain and numbness, yet Dr. Main observed fairly good objective findings, e.g., full fluid range of motion in the shoulder, no significant crepitus, good external rotation and supraspinatus strength, and unchanged hand examination. Dr. Main could not explain plaintiff's persistent symptoms and advised that he see a hand surgeon. (Tr. at 22.) Plaintiff returned to Dr. Main in November 2009, the month before his date last insured, with Dr. Main documenting shoulder pain and tenderness but good subscapular strength. Plaintiff declined

11

an injection, and Dr. Main recommended physical therapy. (Tr. at 23.) The ALJ found that the evidence from the onset date through the date last insured revealed that plaintiff continued to report symptoms affecting the right upper extremity but displayed relatively good objective findings. (Tr. at 23.)[2]

The ALJ found plaintiff's statements about disabling symptoms not entirely consistent with the medical evidence prior to the date last insured. While medical testing shortly before the onset date showed moderately severe right carpal tunnel syndrome, plaintiff indicated that wearing wrist splints at night was somewhat helpful. He underwent shoulder surgeries prior to the onset date but had reasonably good objective findings during the relevant period. In May 2009, he displayed full fluid range of motion in the shoulder, no significant crepitus, good external rotation and supraspinatus strength, and an unchanged hand examination. In November 2009, he had some shoulder pain and tenderness but good subscapular strength. (Tr. at 24.)

As for the opinion evidence, the ALJ gave partial weight to the reports of the agency medical consultants, Drs. Chan, Khorshidi, and Chelton. At the initial level, Dr. Chan opined that plaintiff could perform light work with no overhead reaching and occasional lateral reaching/handling with the right upper extremity. Drs. Khorshidi and Chelton opined that plaintiff could perform light work with occasional lateral reaching with the right upper extremity, no lifting overhead with the right upper extremity, and frequent handling with the right upper extremity. The ALJ found the opinions about light work supported by the evidence showing that

_____

[2]The ALJ also reviewed the later medical evidence, noting that plaintiff underwent right shoulder total arthroplasty in July 2012. (Tr. at 23.) As of 2019, he had various active problems including right carpal tunnel syndrome, cervical spondylosis, cervicalgia, chronic pain, lumbago, and bilateral shoulder impingement. (Tr. at 23-24.)

12

plaintiff had degenerative joint disease, glenohumeral arthrosis, carpal tunnel syndrome, and degenerative disc disease, but he exhibited adequate function in 2009 including good supraspinatus strength, full fluid range of motion in the shoulder, an unchanged hand examination, and no significant crepitus. He also had relatively good objective findings on examination in September 2008, including good motor strength and no evidence of radiculopathy. In May 2008, he had decreased sensation in the right upper extremity but 5/5 strength in the neck and in the upper and lower extremities and a normal tandem gait. Accordingly, the ALJ found, the objective evidence prior to the date last insured indicated that plaintiff could perform light work. The evidence at the hearing level did not establish significantly greater limitations or impairments during the relevant period. (Tr. at 24.)

The ALJ found the consultants' opinion about no overhead reaching with the right arm supported by plaintiff's subjective reports in 2009 of persistent shoulder pain. This restriction was also supported by Dr. Main's April 2007 exam during which plaintiff could forward elevate to about 90 degrees and get only a little bit higher passively. This limitation was also largely consistent with Dr. Main's assessment in April 2017 of no overhead activities. (Tr. at 25.)

The ALJ found Drs. Khorshidi and Chelton's assessments of frequent handling with the right upper extremity more supported by the evidence than Dr. Chan's assessment of occasional handling. While the evidence showed moderately severe right carpal tunnel syndrome, plaintiff's neurology visits closest to the onset date revealed 5/5 strength in the upper extremities, including the wrists, fingers, and thumbs. He exhibited decreased sensation to pinprick and temperature in the right upper extremity but normal proprioception and vibration sensation. Plaintiff followed up with Dr. Main in 2009, and on May 4, 2009, Dr. Main noted full fluid range of motion in the shoulder, no significant crepitus, and good external rotation. The

13

ALJ found that this evidence supported a limitation to frequent lateral reaching with the right upper extremity. Dr. Main did not offer an opinion specifically about plaintiff's permanent limitation for lateral reaching. (Tr. at 25.)

The ALJ noted Dr. Chelton's statement that no weight could be given to Dr. Main's assessment of permanent restrictions because this issue was reserved for the Commissioner. The ALJ gave no weight to Dr. Chelton's statement about Dr. Main's opinion, noting that Dr. Main offered a number of specific work-related limitations. The ALJ further noted that under the regulations applicable to this claim more weight is generally given to the opinions of treating sources, and that such opinions may be given controlling weight if well supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with other substantial evidence in the record. If not given controlling weight, the opinion had to be evaluated under the factors in 20 C.F.R. § 404.1527. (Tr. at 25.)

The ALJ then considered the assessments by Dr. Main throughout the treatment records. Dr. Main noted that plaintiff should stay off work on multiple occasions prior to the alleged onset date. Eventually, in December 2005, Dr. Main indicated that plaintiff could return to medium work, consistent with the recommendations from a functional capacity evaluation. In September 2006, following another shoulder surgery, Dr. Main indicated that plaintiff could return to seated, left-handed work. Dr. Main offered work restrictions on multiple subsequent occasions. (Tr. at 26.)

In April 2007, Dr. Main opined that plaintiff had a permanent partial disability rating of 50%. He further opined that plaintiff could perform no overhead activities, could lift 10 pounds to shoulder height, and could lift 30 pounds at the side. He renewed those restrictions in September 2008. In July 2011, well after the date last insured, Dr. Main stated plaintiff should

14

"[c]ontinue current work status."  (Tr. at 26.)

Although Dr. Main was plaintiff's treating orthopedic surgeon during the relevant period, the ALJ gave little weight to his work limitations prior to April 2007.  Some of those assessments were conclusory and merely stated plaintiff should remain off work.  Others stated plaintiff could return to work with varying degrees of limitations.  (Tr. at 26.)  Dr. Main's treatment notes indicated these were temporary restrictions.  (Tr. at 26-27.)  They were offered several years before the alleged onset date and were superseded by the permanent restrictions Dr. Main set forth in the spring of 2007.  (Tr. at 27.)

As for the opinions in April 2007, the ALJ gave little weight to Dr. Main's disability rating of 50%, which was made in the context of workers' compensation case, which defined "disability" differently.  (Tr. at 27.)  The ALJ gave some weight to the "no overhead activities" restriction, which found support in Dr. Main's April 2007 exam during which plaintiff could forward elevate to about 90 degrees and get only a little bit higher passively.  Further, a limitation to no overhead reaching with the right upper extremity was consistent with the assessments of the agency consultants.  However, Dr. Main's assessment was somewhat vague because he did not specify if the restriction applied to the left arm, the right arm, or both.  (Tr. at 27.)  The ALJ gave little weight to the lifting restrictions of 10 pounds to shoulder height and 30 pounds at the side "because they are not entirely supported by the medical evidence."  (Tr. at 27.)  Dr. Main's exam notes from April 2007 indicated that plaintiff had some weakness with external rotation but later asserted that his strength was good.  It was unclear from the exam notes whether Dr. Main examined how much weight plaintiff could lift or carry at shoulder height and at the side.  Moreover, Dr. Main's objective findings from around the amended onset date through the date last insured "do not entirely support these limitations."  (Tr. at 27.)  Dr.

15

Main observed relatively good function during physical exams in 2009 without documenting specific differences in plaintiff's abilities to lift or carry weight at shoulder height or at the side. In May 2009, Dr. Main observed that plaintiff had full fluid range of motion in the shoulder, no significant crepitus, good external rotation and supraspinatus strength, and an unchanged hand examination. As of November 2009, Dr. Main observed that plaintiff had tenderness along the biceps and subscapularis but good subscapular strength. Additionally, Dr. Main's assessment was somewhat vague because he did not clarify if the limitations applied to lifting, carrying, or both. Nor did Dr. Main's assessment clarify if the limitations applied to the left arm, the right arm, or both. Finally, no other medical source set forth restrictions of 10 pounds to shoulder height and 30 pounds at the side. (Tr. at 27.)

The ALJ gave little weight to the August 2007 functional capacity evaluation completed by Lisa Hannes, P.T., which indicated that plaintiff could perform sedentary to light work, could not use his upper extremity in the manner he used it in his past job, and affirmed the disability rating offered by Dr. Main. (Tr. at 27-28.) The ALJ noted that Hannes had the benefit of examining plaintiff, but she was not an "acceptable medical source" under the regulations. Moreover, she conducted this exam well before the alleged onset date and thus did not have the opportunity to consider plaintiff's functioning during the relevant period. The ALJ also stated that clinical findings from May of 2008 and 2009 suggested some improvement in plaintiff's functioning after Hannes offered her opinions. (Tr. at 28.)

On March 9, 2020, the Appeals Council declined to review the ALJ's second decision, (Tr. at 1), making it the final decision of the Commissioner. See Jeske v. Saul, 955 F.3d 583, 587 n.2 (7th Cir. 2020). This action followed.

16

## II. DISCUSSION

### A.    Standard of Review

The court will uphold an ALJ's decision if it uses the correct legal standards, is supported by substantial evidence, and contains an accurate and logical bridge from the evidence to the conclusions. Jeske, 955 F.3d at 587. "Substantial evidence" means such relevant evidence that a reasonable mind could accept as adequate to support a conclusion. Id. In determining whether the decision is adequately supported, the court reviews the entire record, but it will not replace the ALJ's judgment with its own by reconsidering facts, re-weighing or resolving conflicts in the evidence, or deciding questions of credibility. Id. In building the required bridge, the ALJ must analyze the evidence with enough detail and clarity to permit meaningful appellate review, Briscoe v. Barnhart, 425 F.3d 345, 351 (7th Cir. 2005), although he need not address every piece of evidence in the record, Craft v. Astrue, 539 F.3d 668, 673 (7th Cir. 2008).

If the court determines that the ALJ failed to adequately support or explain his conclusions, the ordinary remedy is a remand for further proceedings. Kaminski v. Berryhill, 894 F.3d 870, 875 (7th Cir. 2018). "In unusual cases, however, where the relevant factual issues have been resolved and the record requires a finding of disability, a court may order an award of benefits." Id.; see also Martin v. Saul, 950 F.3d 369, 376 (7th Cir. 2020) ("That remedy is a marked departure from our typical practice of remanding to the agency for further proceedings.").

17

**B.     Plaintiff's Arguments**

**1.     Dr. Main's Opinion**

Under the regulation applicable to this claim, a treating physician's opinion is entitled to "controlling weight" if well-supported by medical findings and not inconsistent with other substantial evidence in the record.  20 C.F.R. § 404.1527(c)(2) ("Evaluating opinion evidence for claims filed before March 27, 2017."); Larson v. Astrue, 615 F.3d 744, 749 (7th Cir. 2010).  An ALJ must offer "good reasons" for declining to give controlling weight to the opinion of a treating physician.  Larson, 615 F.3d at 749.  If the opinion does not meet the test for controlling weight, the ALJ must determine how much weight the opinion does deserve, considering a checklist of factors including the length, nature, and extent of the treatment relationship; the frequency of examination; the physician's specialty; the types of tests performed; and the consistency and supportability of the physician's opinion.  See 20 C.F.R. § 404.1527(c)(2)-(5); see also Bauer v. Astrue, 532 F.3d 606, 608 (7th Cir. 2008) (stating that when the treating physician's opinion is not given controlling weight "the checklist comes into play").

As indicated above, in his 2019 decision, the ALJ partially credited Dr. Main's April 2007 restrictions.[3]  He gave some weight to the "no overhead activities" restriction, which he found

---

[3]The Commissioner argues that the ALJ was permitted change his mind about Dr. Main's opinion when the case came back on remand.  (Def.'s Br. at 1-2.)  I do not read plaintiff's main brief as arguing otherwise.  In reply, plaintiff suggests that the ALJ violated the Appeals Council's remand order in reconsidering Dr. Main's opinion.  (Pl.'s Rep. Br. at 1.)  However, plaintiff developed no such argument in his main brief.  See Carter v. Astrue, 413 Fed. Appx. 899, 906 (7th Cir. 2011) ("Carter waived this argument by raising it for the first time in his reply brief[.]"); see also Poyck v. Astrue, 414 Fed. Appx. 859, 861 (7th Cir. 2011) ("The question whether the ALJ complied with the Appeals Council's remand order is not, in the final analysis, of independent importance. The only question properly before us is whether the ALJ's decision (which the Appeals Council chose to leave undisturbed) is supported by substantial

18

supported by Dr. Main's April 2007 examination of plaintiff's right shoulder and consistent with

the agency consultants' assessment of no overhead reaching with the right upper extremity.

However, the ALJ found Dr. Main's assessment somewhat vague because it did not specify

if the restriction applied to the left arm, the right arm, or both. The ALJ gave little weight to the

lifting restrictions of 10 pounds to shoulder height and 30 pounds at the side because they were

"not entirely supported by the medical evidence," including Dr. Main's exam findings of good

strength.[4] The ALJ further noted that it was unclear from the exam notes whether Dr. Main

examined how much weight plaintiff could lift or carry at shoulder height and at the side, nor

did the exam notes document specific differences in plaintiff's abilities to lift or carry weight at

shoulder height or at the side. Additionally, the ALJ found this assessment somewhat vague

_____

evidence.").

[4]Plaintiff argues that the ALJ applied the wrong legal standard when he found Dr. Main's restrictions "not entirely supported" by the medical evidence. (Pl.'s Br. at 17; Pl.'s Rep. Br. at 7.) The operative regulation assigns controlling weight if the opinion "is not inconsistent with the other substantial evidence in [the] case record," 20 C.F.R. § 404.1527(c)(2), and the checklist indicates that "the more consistent a medical opinion is with the record as a whole, the more weight we will give to that medical opinion." Id. § 404.1527(c)(4). Neither require that an opinion be "entirely consistent" with the record to receive weight. I do not read the ALJ's phrasing as imposing a higher legal standard. As the Commissioner notes, this appears to have been an observation about the evidence rather than a statement of the legal standard. (Def.'s Br. at 9.) Earlier in his decision, the ALJ set forth the proper test for controlling weight, as well as requirement that he consider the checklist if the opinion did not get controlling weight. (Tr. at 25.) Moreover, the use of imprecise boilerplate phrases does not require remand, so long as the ALJ goes on to provide specific reasons for his decision. In such situations, it is better to analyze the reasons the ALJ actually gave rather than criticizing the boilerplate. See Seibel v. Saul, No. 19-CV-643, 2020 U.S. Dist. LEXIS 63029, at *20 (E.D. Wis. Apr. 8, 2020) ("Plaintiffs would do better to forgo challenging the boilerplate and instead focus on what the ALJ actually does in the decision."). Finally, to the extent the ALJ did apply an incorrect standard, requiring the opinion be entirely consistent (rather than not inconsistent) with the other evidence, the proper remedy is to remand for consideration under the correct standard. See Cathy M. v. Kijakazi, No. 1:20-cv-01637-TWP-DLP, 2021 U.S. Dist. LEXIS 171030, at *5 (S.D. Ind. Sept. 8, 2021) (citing Karr v. Saul, 989 F.3d 508, 513 (7th Cir. 2021)).

because Dr. Main did not clarify if the limitations applied to lifting, carrying, or both, nor did he clarify whether the limitations applied to the left arm, the right arm, or both.  Finally, the ALJ noted that no other medical source set forth restrictions of 10 pounds to shoulder height and 30 pounds at the side.

Plaintiff contends that, contrary to the ALJ's suggestion that other sources disagreed, Drs. Chan and Khorshidi both found Dr. Main's opinion well-supported, not inconsistent with other substantial evidence, and thus entitled to controlling weight.  (Pl.'s Br. at 11, citing Tr. at 116, 128.)  Plaintiff argues that the ALJ mischaracterized the consultants' opinions, resulting in a failure to acknowledge that Dr. Main's limitations were corroborated by neutral physicians selected by the agency.  (Pl.'s Br. at 12.)

As the Commissioner acknowledges, the agency explanations in this case were somewhat confusing.  (Def.'s Br. at 9-10.)  While the "Assessment of Policy Issues" sections purported to give "controlling weight" to Dr. Main's opinions (Tr. at 115-16, 128), the "Residual Functional Capacity" sections indicated that plaintiff could lift and carry 20 pounds occasionally and 10 pounds frequently.  (Tr. at 116, 128-29.)  Both consultants noted Dr. Main's restrictions in the explanatory section (Tr. at 117, 129), but neither specifically incorporated those restrictions into the RFC.  The ALJ's point—that other physicians declined to adopt specific lifting restrictions like Dr. Main's—is technically correct.  In reply, plaintiff indicates that the consultants never specifically said that he could lift 20 pounds to all heights and through all ranges of motion.  (Pl.'s Rep. Br. at 9.)  However, I cannot assume from their silence on these issues that the consultants fully agreed with Dr. Main.  The evidence is ambiguous, and it is not the role of the court to resolve the ambiguity.

Plaintiff next contends that, contrary to the ALJ's suggestion, Dr. Main's opinion was not

20

unworkably vague.  (Pl.'s Br. at 12.)  He notes that the agency consultants appeared to understand the opinion, finding it entitled to controlling weight.  (Pl.'s Br. at 12.)

As indicated above, the consultants' RFC assessments differ somewhat from Dr. Main's restrictions.  But it is worth noting that the consultants read the "no overhead activities" restriction as applying to the right upper extremity.  (Tr. at 117, 129.) In other words, unlike the ALJ, they were not confused as to whether the limitations applied to the left arm, the right arm, or both.  In any event, as plaintiff notes (Pl.'s Br. at 12) and as the Appeals Council also stated in its remand order (Tr. at 161), the ALJ was authorized to seek clarification if he found Dr. Main's opinion unclear.  See 20 C.F.R. § 404.1520b(b)(2)(i) ("We may recontact your medical source.").

Plaintiff also challenges the ALJ's reliance on Dr. Main's muscle strength testing, noting that such testing does not predict whether a person can lift a specific weight throughout the day and may be subjective depending on the examiner's perceptions.  (Pl.'s Br. at 13.)  The ALJ stated that Dr. Main's treatment records did not document any testing of plaintiff's weight lifting ability, but as the Seventh Circuit has held, a treating source need not replicate a workday in order to estimate a patient's abilities.  See Brown v. Colvin, 845 F.3d 247, 253 (7th Cir. 2016); see also Rockwell v. Saul, 781 Fed. Appx. 532, 537 (7th Cir. 2019) ("Dr. Smith's failure to mention in his treatment notes the limitations he included in his physical capacities report does not imply that Dr. Smith exaggerated in the latter.").  The ALJ also accepted the lifting limitations endorsed by the consultants, despite the absence of records directly showing that plaintiff could lift 20 pounds occasionally and 10 pounds frequently.  See Bjornson v. Astrue, 671 F.3d 640, 648 (7th Cir. 2012) (reversing where the ALJ applied criteria inconsistently depending on the source).

21

In any event, plaintiff <u>did</u> undergo testing of his various lifting abilities during the August 2007 functional capacity evaluation. As indicated above, the evaluation recommended lifting restrictions somewhat more severe than did Dr. Main. (Tr. at 985.) The authors concluded that their objective testing established that the disability rating offered by Dr. Main was "fairly accurate." (Tr. at 986.)

The ALJ gave the August 2007 FCE "little weight." However, the ALJ did not consider the extent to which this evaluation corroborated Dr. Main's opinions. <u>See</u> <u>Rockwell</u>, 781 Fed. Appx. at 537 (remanding where the ALJ failed to consider the extent to which a nurse practitioner's opinion corroborated the treating source). The ALJ faulted Dr. Main for not documenting specific differences in plaintiff's abilities to lift or carry weight at shoulder height or at the side, but the FCE tested lifting from floor to waist and from waist to shoulder; the FCE also distinguished plaintiff's abilities on the left, the right, and bilaterally, another alleged shortcoming in Dr. Main's opinion.

In giving the FCE little weight, the ALJ noted that therapist Hannes was not an "acceptable medical source,"[5] that the evaluation was conducted well before the amended onset date, and that subsequent clinical findings from 2008 and 2009 suggested some improvement in plaintiff's functioning. While the ALJ correctly noted that physical therapists

---

[5]Plaintiff complains that the ALJ failed to correctly identify the authorship of the FCE report, which was completed not just by Lisa Hannes, P.T., but also by Michael Hannes [sic], P.T. (Pl.'s Br. at 20-21.) Plaintiff does not explain why the ALJ's failure to acknowledge the involvement of two physical therapists rather than one requires remand. This is not a situation where the FCE report was co-authored or counter-signed by a physician or other acceptable medical source. <u>See</u> <u>Wright v. Kijakazi</u>, No. 20-2715, 2021 U.S. App. LEXIS 25960, at *17 (7th Cir. Aug. 27, 2021) (noting that the ALJ need not mention every piece of evidence, and that the court gives his opinion a commonsensical reading rather than nitpicking at it).

22

are not acceptable medical sources (whose opinions may be given controlling weight), their reports are entitled to consideration. Barrett v. Barnhart, 355 F.3d 1065, 1067 (7th Cir. 2004); see also Thomas v. Colvin, 826 F.3d 953, 961 (7th Cir. 2016) ("Even though a physical therapist is not an acceptable medical source for determining a claimant's impairments, this evidence may be used to show the severity of an impairment and how it affects a claimant's ability to function."). Under the circumstances here, where the ALJ discounted Dr. Main's April 2007 opinion based on the absence of objective testing in Dr. Main's treatment notes, consideration of the therapists' functional evaluation completed a just a few months later seems particularly important.

The ALJ also correctly noted that the August 2007 FCE was completed about two years before the alleged onset date. However, no functional testing was conducted more proximately, and the ALJ pointed to no specific evidence that plaintiff's condition improved during that time. The ALJ vaguely referenced May of 2008 and 2009 clinical findings suggesting improvement, but he did not specify those findings or explain how they undercut the results of the FCE. The ALJ discussed the medical evidence in more detail earlier in his decision, but even reading the decision as a whole, see Curvin v. Colvin, 778 F.3d 645, 650 (7th Cir. 2015) (noting that it is proper to read the ALJ's decision as a whole), I cannot discern the basis for the ALJ's finding of improvement.[6] Importantly, other evidence suggests that plaintiff's condition worsened during that time. For instance, in March 2011, after reviewing a repeat MRI, Dr. Main stated that plaintiff's glenohumeral arthrosis "has progressed markedly

_____

[6]Perhaps the ALJ was referring to the May 2008 exam by Dr. Amy Kahn, a neurologist, (see Tr. at 21, citing Tr. at 811-12), during which Dr. Khan noted normal strength, reflexes, and gait. Absent further explanation, however, it is hard to see how this exam undercut Dr. Main's April 2007 restrictions. The vague reference to 2009 clinical findings is even harder to follow.

in the last five years." (Tr. at 654; see Tr. at 709-10, 2/16/11 MRI documenting "severe degenerative changes"; Tr. at 722-23, 4/18/07 MRI documenting "moderately severe degenerative arthritis".) The Commissioner does not specifically respond to plaintiff's arguments regarding the 2007 FCE. See Lechner v. Barnhart, 321 F. Supp. 2d 1015, 1030 (E.D. Wis. 2004) ("The Commissioner fails to specifically address this argument in her brief. Therefore, she has waived her right to do so.").

The Commissioner argues that most of plaintiff's arguments boil down to little more than a contention that the ALJ should have weighed the evidence differently. (Def.s' Br. at 8.) To be sure, the court will not reverse an ALJ's decision on this basis. See, e.g., Sanders v. Colvin, 600 Fed. Appx. 469, 470 (7th Cir. 2015) ("[A]n ALJ's job is to weigh conflicting evidence, and the loser in such a process is bound to believe that the finder of fact should have been more favorable to his cause."). But the problem is here is that the ALJ failed to consider the extent to which the FCE corroborated Dr. Main's restrictions, filling in the gaps found by the ALJ. The ALJ also failed to explain the basis for his conclusion that plaintiff's condition improved between 2007 and 2009, nor, it appears, did he consider re-contacting Dr. Main for clarification rather than dismissing his opinions as vague.

### 2. Remedy

Relying on Kaminski, where the Seventh Circuit awarded benefits after finding a treating source opinion entitled to controlling weight, plaintiff seeks such a remedy here. Plaintiff argues that, like the neurologist in Kaminski, Dr. Main (an orthopedic surgeon), specializes in shoulder impairments; Dr. Main treated plaintiff consistently over several years; and Dr. Main's opinions are supported by and consistent with the objective evidence, including FCE testing and imaging. (Pl.'s Br. at 18.) Plaintiff further argues that Dr. Main's opinions are not

24

meaningfully contradicted by Drs. Khorshidi and Chan, who found those opinions entitled to controlling weight. (Pl.'s Br. at 19.) Finally, plaintiff states that his application has been pending for six years, the matter has already been remanded once based on errors in evaluating Dr. Main's opinions, and there is no reason to impose further delays. (Pl.'s Br. at 20.)

"An award of benefits is appropriate . . . only if all factual issues involved in the entitlement determination have been resolved and the resulting record supports only one conclusion—that the applicant qualifies for disability benefits." Allord v. Astrue, 631 F.3d 411, 415 (7th Cir. 2011). Factual issues remain to be resolved in this case, including the proper evaluation of the FCE, particularly as it relates to Dr. Main's opinions and the alleged ambiguities in those opinions noted by the ALJ, and the extent to which the consultants' opinions varied from Dr. Main's. While the court is sympathetic to the delays in concluding this matter, delay alone does not support a judicial award. See Israel v. Colvin, 840 F.3d 432, 441-42 (7th Cir. 2016).

I also note that, to the extent plaintiff relies on the VE's response that there would be "no jobs" for a person with Dr. Main's limitations (see Pl.'s Rep. Br. at 10), that testimony was confusing. The VE appeared to construe the limitation of "no overhead activities" to mean the person was incapable of reaching in any direction. (Tr. at 72-73.) Dr. Main did not specifically address plaintiff's ability to reach in directions other than overhead, as the ALJ noted. (Tr. at 25, "Dr. Main did not offer an opinion specifically about the claimant's permanent limitation for lateral reaching.") Earlier in her testimony, in response to the ALJ's hypothetical question, the VE identified a number of jobs for a person who could not reach overhead but could reach in other directions with the right arm. (Tr. at 63-65.) The VE also seemed to suggest that

25

because the DOT does not distinguish between different types of reaching or levels of lifting, she was required to base her responses on the lowest capacity included in the hypothetical. (Tr. at 72.) A VE is permitted to provide more specific information about jobs than the DOT; the DOT does not automatically govern. <u>Phillips v. Colvin</u>, 171 F. Supp. 3d 819, 826 (E.D. Wis. 2016).

The Commissioner argues that, if the matter is remanded, the court should not mandate a new hearing. Plaintiff applied for DIB only, his insured status lapsed years ago, and plaintiff has already had the opportunity to testify about his condition during the relevant period. The Commissioner further notes that agency policy does not require a hearing under these circumstances, instead leaving the issue to the discretion of the ALJ. (Def.'s Br. at 11-14.) While I will not specifically direct a new hearing be held, I note that the issues with the vocational testimony discussed above may necessitate the receipt of additional vocational evidence (if the evaluation reaches the point).

### III. CONCLUSION

**THEREFORE, IT IS ORDERED** that the ALJ's decision is reversed, and the matter is remanded for further proceedings consistent with this decision pursuant to 42 U.S.C. § 405(g), sentence four. The clerk is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin this 15th day of September, 2021.

/s/ Lynn Adelman
LYNN ADELMAN
District Judge

26